UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/23/2024
```

---------------------------------------------------------------X
AGCS MARINE INSURANCE COMPANY,      :
et al.,                             :
                                    :
                        Plaintiffs, :      22-CV-9283 (LGS) (RWL)
                                    :
          - against -               :
                                    :      **REPORT AND RECOMENDATION**
                                    :      **TO HON. LORNA G. SCHOFIELD:**
                                    :      **MOTIONS FOR SUMMARY JUDGMENT**
M/V IMABARI LOGGER et al.,          :
                                    :
                        Defendants. :
                                    :
---------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiffs AGCS Marine Insurance Company ("AGCS") and Weatherford Artificial

Lift Systems, LLC ("Weatherford," together with AGCS, "Plaintiffs") brought this action

against Defendants M/V Imabari Logger, *in rem* (the "Vessel" or "*In Rem* Defendants"),

and "Danmar Lines Ltd., Danmar Lines AG d/b/a Danmar Lines Ltd., Danzas Corporation

d/b/a Damar Lines Ltd. *in personam* ("Danmar"), and consolidated Defendant Air Express

International USA, Inc. d/b/a DHL Global Forwarding ("Air Express," collectively

"Defendants") asserting claims in admiralty for damages arising from the loss of and

damage to Rotaflex pumping units (the "Rotaflex Machines" or "Cargo") during the

Vessel's transatlantic journey from China to Washington state.  Plaintiffs allege the cargo

– carried on-deck – consisted of 50 Rotaflex Machines of which 26 were lost overboard

and 21 were damaged.  Defendants have moved for summary judgment to dismiss all

claims.  Alternatively, Defendants seek partial summary judgment on the issue of

limitation of liability.  For the reasons set for below, the Court recommends that (1)

Defendants' motions for summary judgment to dismiss all claims be DENIED; (2) *In Rem*

Defendants' motion for partial summary judgment be GRANTED; (3) Defendant Danmar's motion for partial summary judgment be GRANTED; and (4) Defendant Alix Express's motion for partial summary judgment be DENIED.

## BACKGROUND[1]

### A.    The Cargo

Weatherford purchased 50 Rotaflex Machines and organized their shipment from China to the United States.  (Complaint ("Compl."), Dkt. 1 ¶¶ 1, 7.)  The Rotaflex Machines are "designed to be used for oil production on non-flowing wells by means of reciprocating-rod pumping."  (Danmar 56.1 Reply ¶ 32; In Rem 56.1 Reply ¶ 36; Hamra Decl. Ex. 9 at ECF 3.)  On March 5, 2015, Weatherford contracted with Air Express to provide certain services ("Freight Forwarding Services") to Weatherford in connection

---

[1] The facts are drawn from:  Danmar Defendants' Response To Plaintiffs' Opposition And To Counterstatement Of Undisputed Facts at Dkt. 85 ("Danmar 56.1 Reply"); Imabari Logger Ltd.'s Response to Plaintiffs' Opposition And Counterstatement Of Undisputed Facts at Dkt. 83 ("In Rem 56.1 Reply"); Danmar Defendants' Statement Of Material Facts Pursuant To Local Civil Rule 56.1 at Dkt. 64 ("Danmar 56.1"); Imabari Logger Ltd's Rule 56 Statement Of Undisputed Facts In Support Of Its Motion For Partial Summary Judgment Against Plaintiffs at Dkt. 58 ("In Rem 56.1"); the Declaration of Noe S. Hamra at Dkt. 67 ("Hamra Decl."); the Declaration of Peter Skoufalos at Dkt. 68 ("Skoufalos Decl."); and the Deposition of Benson Thomas ("Thomas Dep.") at Dkt.67-8 (duplicated at Dkts. 68-6, 71-10.)  The parties' summary judgment briefs include the Memorandum Of Law In Support Of Motion For Summary Judgment On Behalf Of Defendants Danmar Lines Ltd; Danmar Lines Ag D/B/A Danmar Lines Ltd., Danzas Corporation d/b/a Danmar Lines Ltd. And Consolidated Defendant Air Express International USA, Inc. at Dkt. 63 ("Danmar Mem."); Owner Imabari Logger Ltd.'s Memorandum Of Law In Support Of Its Motion For Summary Judgment at Dkt. 59 ("In Rem Mem."); Plaintiffs' Memorandum Of Law In Opposition To The Motions For Summary Judgment Filed By The In Rem Defendant [ECF No. 56] And By The Danmar Defendants [ECF No. 61] at Dkt. 78 ("Pl. Opp."); Reply Memorandum Of Law Of Defendants Danmar Lines Ltd; Danmar Lines Ag, Danzas Corporation And Consolidated Defendant Air Express International USA, Inc. at Dkt. 84 ("Danmar Reply"); and Owner Imabari Logger Ltd.'s Reply In Support Of Its Motion For Summary Judgment at Dkt. 81 ("In Rem Reply").  Unless otherwise indicated, the facts are undisputed.

with the shipment of the Cargo.  (Danmar 56.1 Reply ¶¶ 75-76.)  Danmar, as the Non-Vessel Operating Common Carrier ("NVOCC"[2]) for the shipment at issue (In Rem 56.1 Reply ¶ 18), contracted with the Vessel to provide the services and carry the Cargo from Tianjin, China to Everett, Washington in the United States.  (Compl. ¶ 13.)

The Cargo included 5 Rotaflex Machines model 1100RT and 45 Rotaflex Machines model 1150RT, with a total cost value of $5,853,628.35.  (Thomas Dep. Tr. 139:5-140:10; Compl., Schedule A at ECF 15; *see also* Danmar 56.1 Reply ¶ 31; In Rem 56.1 Reply ¶ 35.)  The Rotaflex Machine model 1100RT weighs 138.0 metric tons, and the Rotaflex Machine model 1150RT weighs 1289.7 metric tons.  (Skoufalos Decl. Ex. 5; Danmar 56.1 Reply ¶¶ 35-36; In Rem 56.1 Reply ¶¶ 39-40.)  When shipped, the Rotaflex Machines were collapsed into a horizonal position.  (Danmar 56.1 Reply ¶ 33; In Rem 56.1 Reply ¶ 37; Hamra Decl., Ex. 12.)  The manufacturer of the Rotaflex Machines created a data book (the "Data Book") containing instructions for purchasers regarding the Rotaflex Machines' use, including a "packaging list" for international and domestic shipping dictating "various checks required to be performed on every Rotaflex Machine after it has

---

[2] An NVOCC is a common carrier that "does not operate the vessels by which the ocean transportation is provided; and … is a shipper in its relationship with an ocean common carrier."  46 U.S.C. § 40102(17); *see also Royal & Sun Alliance Insurance, PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 140 n.2 (2d Cir. 2010) ("An NVOCC will issue a bill of lading to the shipper but does not undertake the actual transportation of the cargo. Instead, the NVOCC delivers the shipment to an ocean carrier for transportation").

[2] "A bill of lading is, in the first instance and most simply, an acknowledgment by a carrier that it has received goods for shipment. Secondly, the bill is a contract of carriage. Thirdly, if the bill is negotiated ... it controls possession of the goods and is one of the indispensable documents in financing the movement of commodities and merchandise throughout the world."  *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 823 n.2 (2d Cir. 2006) (quoting Grant Gilmore & Charles L. Black, Jr., *The Law Of Admiralty* 93 (2d ed. 1975)).

been packed and before it can be accepted for shipping." (Danmar 56.1 Reply ¶¶ 40-41, 43; In Rem 56.1 Reply ¶¶ 43, 45, 47; Thomas Dep. Tr. 150:2-13; Skoufalos Decl., Ex. 9.) Some of those steps include: the installation of wooden wedges between each corner of the counterweight box and tower beams to prevent the Rotaflex Machine from moving during shipment; the installation of a belt guard inside the mid tower platform; the deinstallation of the front platform, removable platform, unit guard, bottom ladder cage segments, belt guard, rollback, and slot sensor assemblies; and the placement of bubble wrap, a shipping cover, and braided cables around the Rotaflex Machine. (Danmar 56.1 Reply ¶¶ 47, 50-51, 56, 58; In Rem 56.1 Reply ¶¶ 51, 53, 54, 59, 60, 62.) The Data Book also instructs that none of the "protection material or equipment" be removed from the Rotaflex Machine until it has been brought to the wellsite. (Danmar 56.1 Reply ¶ 64; In Rem 56.1 Reply ¶ 67.)

On January 10, 2022, the Rotaflex Machines were loaded onto the deck of the Vessel.[3] (Danmar 56.1 Reply ¶ 65-66; In Rem 56.1 Reply ¶ 68-69; Compl. ¶ 14.) On or about January 19, 2022, the Vessel departed from Port of Tianjin, China, with the Rotaflex Units on-deck.[4] (Danmar 56.1 Reply ¶ 67; In Rem 56.1 Reply ¶ 70.) During the voyage,

---

[3] The Vessel is owned by Imabari Logger Ltd. ("Vessel Owner"). (Dkt. 14.)

[4] For the purposes of this opinion, references to "on-deck" cargo refer to cargo that is not in a container or placed below deck.

26 Rotaflex Machines were lost overboard,[5] while others were damaged.[6]  (Danmar 56.1

Reply ¶ 68; In Rem 56.1 Reply ¶¶ 71-73.)  In February 2022, 24 Rotaflex Machines were

discharged at the Port Everett Washington and delivered to Weatherford.  (Danmar 56.1

Reply ¶¶ 69-70; In Rem 56.1 Reply ¶¶ 74-75.)  To date, Weatherford has not received

the remaining 26 Rotaflex Machines that were lost overboard.  (Danmar 56.1 Reply ¶ OO;

In Rem 56.1 Reply ¶ MM.)

**B.    The Contracts**

There are three contractual documents at issue – two bills of lading and a Master

Services Transportation Agreement.

---

[5] While all parties agree that 26 Rotaflex Machines went overboard, they differ in the number of Rotaflex Machines that sustained damage during the voyage.  Defendants assert that for the purposes of calculating damages, 42 Rotaflex Machines were either lost or sustained damage during the voyage.  (Danmar Mem. at 15; In Rem Mem. at 21.) While Defendants admit that 26 Rotaflex Machines went overboard during the voyage (Danmar 56.1 Reply ¶ 68; In Rem 56.1 Reply ¶ 73), Defendants do not provide a concrete number for the number of Rotaflex Machines that sustained damage during the voyage (Danmar 56.1 Reply ¶ 69 ("[s]ome of the remaining [Rotaflex Machines] are alleged to have suffered some degree of damage"); In Rem 56.1 Reply ¶ 74 ("[s]ome of the remaining [Rotaflex Machines] suffered some degree of damage")).  Plaintiffs assert that 26 Rotaflex Machines went overboard, 14 were damaged beyond repair, and 7 were ultimately repaired.  (Pl. Opp. at 29.)  Plaintiffs dispute, however, Defendants' characterization that the Rotaflex Machines sustained "some damage," by pointing to Plaintiffs allegations in the Complaint that 14 Rotaflex Machines could not be used for their intended purpose and 7 required repairs.  (Danmar 56.1 Reply ¶ 69; In Rem 56.1 Reply ¶ 74.)  According to Plaintiffs' calculations, at least 47 Rotaflex Machines – 5 more than Defendants' total – sustained some sort of damage.  Because there is a genuine factual dispute about the number of machines that sustained damage during the voyage, the Court cannot grant summary judgment to the extent a total damages award depends on the specific number of Rotaflex Machines that were either damaged or lost.

[6] Plaintiffs dispute that the Rotaflex Machines were lost or damaged in a storm.  (Danmar 56.1 Reply ¶¶ 68-69; In Rem 56.1 Reply ¶¶ 71, 74.)  The issue, however, is not material to the resolution of the instant motion.

### 1.    Pacific Basin Bill of Lading

On November 22, 2021, Pacific Basin HandySize (HK) LTD ("Pacific Basin"), entered into an agreement with DHL Global Forwarding (China) Co., Ltd ("DHL Global") for the charter of the Vessel to carry no more than 50 Rotaflex Machines.  (In Rem 56.1 Reply ¶ 1; Hamra Decl. Ex. 1.)  On January 18, 2022, Pacific Basin issued a bill of lading[7] No. PBIHIMAIM5701 (the "Pacific Basin BOL").  (In Rem 56.1 Reply ¶ 2; Danmar 56.1 Reply ¶ 16; Hamra Decl., Ex. 2.)  The Pacific Basin BOL lists DHL Global as the "shipper," DHL Global Forwarding as the "consignee," Pacific Basin as the "carrier," and Imabari Logger as the "vessel."  (In Rem 56.1 Reply ¶¶ 3-5; Danmar 56.1 Reply ¶¶ 16-19; Hamra Decl., Ex. 2.)  The port of landing is listed as Xingang, China, and the port of discharge is Everett, USA.  (In Rem 56.1 Reply ¶ 6; Hamra Decl. Ex. 2; Danmar 56.1 Reply ¶ 20.)  Under the heading "Number and kind of packages, description of goods," the Pacific Basin BOL says "50 packages."[8]  (In Rem 56.1 Reply ¶ 7; Hamra Decl. Ex. 2; Danmar 56.1 Reply ¶ 21.)  After the words "Ship's Remarks" the Pacific Basin BOL contains the following description of goods and disclaimer of liability:

> [] DUST ON THE OUTER SURFACE AFFECTED ALL
> PACKAGES, CARGO QUANTITY AS PER TIANJI N OCEAN

---

[7] "A bill of lading is, in the first instance and most simply, an acknowledgment by a carrier that it has received goods for shipment.  Secondly, the bill is a contract of carriage. Thirdly, if the bill is negotiated ... it controls possession of the goods and is one of the indispensable documents in financing the movement of commodities and merchandise throughout the world."  *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 823 n.2 (2d Cir. 2006) (quoting Grant Gilmore & Charles L. Black, Jr., *The Law Of Admiralty* 93 (2d ed. 1975)).

[8] As discussed further below, Plaintiffs dispute whether the cargo consists of "packages" rather than "freight units" (In Rem 56.1 Reply ¶ 7; Danmar 56.1 Reply ¶ 21), but there can be no genuine dispute that "50 packages" appears under the heading "Number and kind of packages, description of goods."  (Hamra Decl., Ex. 2.)

SHIPPING TALLEY CO.,LTD AND QUALITY & WEIGHT AS DECLEARED [sic] BY SHIPPERS

(of which 50PACKAGES / 1427.7MT on-deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)

"50 units shipped on-deck at shippers/charterers risk and responsibility without liability on the part of the vessel/owners for any expense, delays, loss or damage howsoever caused and even if caused by owners' negligence or unseaworthiness of the vessel."[9]

(Hamra Decl., Ex. 2; In Rem 56.1 Reply ¶ 9; Danmar 56.1 Reply ¶ 23.)  Under the heading "TOTAL PACKAGES" it reads "SAY FIFTY PACKAGES ONLY."  (Hamra Decl., Ex. 2; In Rem 56.1 Reply ¶ 10.)  The left bottom corner displays a box with the heading "Freight and charges" with the words "FREIGHT PREPAID" underneath.  (Hamra Decl., Ex. 2.)

On the back, the Pacific Basin BOL contains a number of terms and conditions that the "Shipper, Consignee and the Holder of [the] Bill of Lading hereby expressly accept and agree[d] to" whether, "printed, written or stamped."  (Hamra Decl., Ex. 2; In Rem 56.1 Reply ¶ 8; Danmar 56.1 Reply ¶ 22.)  Under Clause 1, "Merchant" is defined as "the Shipper, the Receiver, the Consignor, the Consignee, the Holder of the Bill of Lading and the Owner of the Goods."  (Hamra Decl., Ex. 2.)  The Pacific Basin BOL has a "Paramount Clause" which states "this [Pacific Basin BOL] shall be subject to the Hague Rules contained in the International Convention for the Unification of Certain Rules of law relating to Bills of Lading, dated at Brussels the 25th August 1924, or the corresponding

---

[9] Even though the last paragraph of this passage is in quotation marks, Plaintiffs dispute *In Rem* Defendants' representation that it is "a part of the ship's remarks" arguing it cannot be characterized as such because it "is not shown in the handwritten ship's remarks on either the Shipping Order or the Mate's Receipt."  (In Rem 56.1 Reply ¶ 9; Danmar 56.1 Reply ¶ 23.)

legislation of the flag-state of the ship."[10]  (Danmar 56.1 Reply ¶ TT; Hamra Decl., Ex. 2, Clause 3.)  The Pacific Basin BOL also contains the following general provision limiting liability:

> The Carrier for any loss of or damage to the goods shall be limited to an amount not exceeding £ 100 per package or freight unit unless the value of the goods higher than the amount is declared in Writing by the Shipper before receipt of the goods by the Carrier and inserted in this Bill of Lading and extra freight paid as required. If the actual value of the goods per package or per freight unit exceeds such value the declared value shall nevertheless be deemed to be the declared value and the Carrier's liability if any, shall not be the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(Hamra Decl., Ex. 2, Clause 12; In Rem 56.1 Reply ¶ 11; Danmar 56.1 Reply ¶ 25.)

Regarding on-deck cargo, the Pacific Basin BOL states:

> DECK CARGO, LIVE ANIMALS AND PLANT. Cargo on-deck, plants and live animals are received, handled, carried, kept and discharged at Merchants risk and the Carrier shall not be liable for loss thereof or damage thereto.

(Hamra Decl., Ex. 2, Clause 15; In Rem 56.1 Reply ¶ 12; Danmar 56.1 Reply ¶ 26.)

### 2.    Danmar Bill of Lading

On January 18, 2022, Danmar issued an Express Sea Waybill No. SHAD92066 ("Danmar BOL").  (Danmar 56.1 Reply ¶ 1; Skoufalos Decl., Ex. 1.)  The Danmar BOL lists Shandong Weatherford Highland Artificial Lift Equipment Co. as the "shipper," Weatherford as the "consignee," Danmar Lines Ltd. as the "carrier," and M/V Imabari Logger as the "vessel."  (Danmar 56.1 Reply ¶¶ 2-4; In Rem 56.1 Reply ¶¶ 19, 21-22;

---

[10] Every bill of lading contains a "clause paramount" which "identifies the law that will govern the rights and liabilities of all parties to the bill of lading."  *Sompo Japan Insurance Company of America v. Union Pacific Railroad Co.*, 456 F.3d 54, 56 (2d Cir. 2006).

Skoufalos Decl., Ex. 1.)  The port of loading is listed as Tianjin, China and the port of discharge is Everett, United States.  (Danmar 56.1 Reply ¶ 6; In Rem 56.1 Reply ¶ 23; Skoufalos Decl., Ex. 1.)  The Danmar Bill of Lading is "governed by and construed in accordance with the laws of the United States of America and particularly 28 USC Section 1300 et seq. of US COGSA."  (In Rem 56.1 Reply ¶ 34; Skoufalos Decl., Ex. 1, Clause 14.2.)

The front of the Danmar Bill of Lading provides that "[i]n accepting this Bill of Lading, the Merchant … expressly accepts and agrees to all its terms, conditions and exceptions whether printed stamped or written, or otherwise incorporated (including without limitation the Terms and Conditions)."  (Danmar 56.1 Reply ¶ 9; In Rem 56.1 Reply ¶ 27; Skoufalos Decl., Ex. 1.)  Under the "Definition" clause of the "Terms and Conditions" section on the reverse side of the Danmar Bill of Lading, "Merchant" is defined as "the Shipper, Consignee, holder of this bill of lading, the receiver of the Goods and any person owning, entitled to or claiming the possession of the Goods or of this bill of lading or anyone acting on behalf of such person."  (Danmar 56.1 Reply ¶ 11; In Rem 56.1 Reply ¶ 29, Skoufalos Decl., Ex. 1.)  "Goods" is defined as "the whole or any part of the cargo, described on the front of this bill of lading and includes any packaging or Container not supplied by or on behalf of the Carrier," and "Package" means "the number of packages stated on the front of the bill of lading."  (Danmar 56.1 Reply ¶ 12; In Rem 56.1 Reply ¶ 30; Skoufalos Decl., Ex. 1.)

Under the heading "Number and kind of packages: description of goods" on the front of the Danmar Bill of Lading it reads "50 package(s),"[11] followed by "Gross Weight in kilos" of "1427700 KG (1427.7 T)," which is then followed by "Measurement in cubic meters" of 6083.700 M3." (Danmar 56.1 Reply ¶ 6; In Rem 56.1 Reply ¶ 24; Skoufalos Decl., Ex. 1.) The "ship's remarks" appearing below the description of the packages are identical to those on the Pacific Basin BOL:

> [] DUST ON THE OUTER SURFACE AFFECTED ALL PACKAGES, CARGO QUANTITY AS PER TIANJIN OCEAN SHIPPING TALLY CO., LTD AND QUALITY & WEIGHT AS DECLEARED [sic] BY SHIPPERS
>
> (of which 50PACKAGES / 1427.7MT on-deck at Shipper's risk; the Carrier not being responsible for loss or damage howsoever arising)"
>
> " 50 units shipped on-deck at shippers/charterers risk and responsibility without liability on the part of the vessel/owners for any expense, delays, loss or damage howsoever caused and even if caused by owners' negligence or unseaworthiness of the vessel."[12]

(Skoufalos Decl., Ex. 1; Danmar 56.1 Reply ¶ 8; In Rem 56.1 Reply ¶ 26.)

Following the ship's remarks, there is a section titled "SHIPPED ON BOARD 18-JAN-22, which is immediately followed underneath by "***Freight Prepaid***." (Skoufalos Decl., Ex. 1.)  That section twice indicates "50 PKG," and repeats the total weight and

---

[11] Plaintiff does not dispute that under this heading, it says "50 package(s)" but also notes, generally that the Danmar BOL also describes the cargo as "units."  (Danmar 56.1 Reply ¶ 6.)  Again, the parties do not dispute that the Danmar BOL is in fact the bill of lading that Danmar issued for the carriage of the Cargo on or about January 18, 2022. Therefore, like the Pacific Basin BOL, the Court will review the Danmar "by [its] terms and consistent with the intent of the parties."  *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 16 (2004).

[12] Plaintiffs dispute Danmar's characterization of the text as "shipper's remarks."  (Danmar 56.1 Reply ¶ 8.)

volume. (Skoufalos Decl. Ex. 1.)  The next section of the Danmar BOL bears the heading "Total No. of containers/packages: 50 PACKAGE(S)" and "ABOVE PARTICULARS AS DECLARED BY SHIPPER."  (Skoufalos Decl. Ex. 1.)  Underneath that heading there is a column for "Freight and charges," under which it says "OCEAN FREIGHT"; a column for "Quantity based on," under which it says "6083.70" (i.e, the total volume of the cargo); columns for "Rate," listing "203.00," and "Per," listing "CBM" (i.e., cubic meters); and a column for "Prepaid," under which appears "USD 1234991.10" (i.e., total ocean freight charge of $1,234, 991.10).  (Skoufalos Decl. Ex. 1; Danmar 56.1 Reply ¶ E.)

Below the freight calculation at the bottom of the front page, the Danmar BOL states "the Carrier's liability is determined and limited in accordance with clause 8 of the TERMS AND CONDITIONS."  (Danmar 56.1 Reply ¶ 10; In Rem 56.1 Reply ¶ 28; Skoufalos Decl., Ex. 1.)  With regard to U.S. carriage, Clause 8 reads:

> 8.1. The Carrier's liability in respect of any loss of or damage to the Goods or delay in the performance of the Services shall be determined and limited in accordance with the provisions of this clause 8 unless:
>
> 8.1.1 in the case of US Carriage, an international convention or national law (including US COGSA) compulsorily applies (**US Compulsory Legislation**), in which case the liability of the Carrier will be determined and limited in accordance with the provisions of such US Compulsory Legislation …
>
> 8.2. Liability for Goods lost or damaged where no Compulsory Legislation applies …
>
> 8.3 Amount of compensation …
>
> 8.3.4 for US Carriage, US$500 per Package or per the freight unit billed for Goods not packaged.

(Skoufalos Decl., Ex. 1 (emphasis in original); Danmar 56.1 Reply ¶ 15; In Rem 56.1 Reply ¶ 33.)  The clause specifically pertaining to on-deck cargo states:

> The Carrier has the right to carry the Goods, whether packed in Containers or not, under deck or on-deck without notice to the Merchant. If the Goods are carried on-deck, the Carrier shall not be required to note, mark or stamp on the bill of lading any statement of such on-deck carriage. All Goods whether carried on-deck or under deck shall participate in General Average. Goods carried on-deck and which are not stated on the front of this bill of lading to be carried on-deck shall be subject to the same liability regime for loss or damage or delay as Goods shipped under deck. Goods which are stated on the front of this bill of lading to be carried on-deck, and which are actually carried on-deck, are carried without responsibility on the part of the Carrier for loss or damage of whatsoever nature arising during carriage of Goods by sea or inland waterway howsoever caused, whether caused by negligence or any other cause whatsoever.

(Skoufalos Decl., Ex. 1, Clause 4.3; Danmar 56.1 Reply ¶ 14; In Rem 56.1 Reply ¶ 32.)

Regarding the Carrier's liability, Clause 2.4 reads:

> In addition to being able to rely on this bill of lading, the Carrier has, absent Compulsory Legislation providing otherwise, the right to avail itself of and invoke any limitation or exclusion of liability, immunity, defence, right, remedy and/or law and jurisdiction clause contained in any Underlying Bill of Lading as if the Carrier were the carrier referred to in the Underlying Bill of Lading (copies of said terms of an Underlying Bill of Lading being available to the Merchant at any office of the Carrier upon request).

(Skoufalos Decl., Ex. 1; Danmar 56.1 Reply ¶ 13; In Rem 56.1 Reply ¶ 31.)

### 3. The Master Transportation Services Agreement

On May 5, 2015, Weatherford contracted with Air Express to provide Freight Forwarding Services to Weatherford in connection with shipment of the Cargo. (Danmar 56.1 Reply ¶¶ 75-76.; Skoufalos Decl., Ex. 11 ¶ 2.1.) Those services included: charter fixture arrangements, hiring of the non-vessel operating carrier and the vessel operating carrier, issuance of the Sea Waybill, pre-voyage inspection of onboard cargo stowage arrangements, freight forwarding services, voyage monitoring services, and notification

of cargo release.  (Skoufalos Decl. Ex. 10 ¶ 11.)  The Master Transportation Services Agreement contains the following provisions limiting liability:

> 6.1 **Standard of Care.** Subject to Article 6.2 below, Company agrees that in connection with any and all services performed by Company or its subcontractors, Company shall be liable for all acts, which are the direct and proximate cause of any injury to Customer, including loss or damage to Customer's Products …

> 6.3 **International Conventions.** International transportation by air, ocean, road, or rail is subject to and governed with the force of law by the liability provisions contained in the following international conventions or statutes, as applicable and without limitation: … the International Convention for the Unification of Certain Rules Relating to Bills of Lading, August 25, 1924 (the "Hague Rules"); the Protocol to Amend the Hague Rules, February 23, 1968 (the "Hague-Visby Rules"); the United States Carriage of Goods by Sea Act, 46 U.S.C. App. §§ 1300 et seq. ("COGSA"); … For all other Services not governed by a specific statute or international convention, Company's liability shall be limited to 8.33 SDR per kilo. For customs brokerage services, Company's liability to Customer in the case of an error or omission, or a series of errors or omissions which are repetitions of or represent the continuation of an original error or omission shall be limited to the lesser of: (a) the loss incurred; or (b) $75,000 USD per occurrence.

(Danmar 56.1 Reply ¶ UU.)

## PROCEDURAL HISTORY

Plaintiffs commenced the instant action against the Vessel and Danmar on October 28, 2022, seeking damages relating to the lost and damaged Cargo and alleging claims for negligence, false sea waybill, and breach of maritime contract, federal common law and bailment obligations.  (Dkt. 1.)  Plaintiffs commenced a separate action against Air Express in the United States District Court for the Southern District of Texas on November 3, 2022, alleging breach of contract and negligence claims stemming from the same shipment of the 50 Rotaflex Machines.  *See AGCS Marine Insurance Company, et*

*al. v. Air Express International USA, Inc.*, 23-CV-3405.  On May 8, 2023, the parties in both cases consented to consolidation of the two cases.  (Dkt. 40.)  On May 10, 2023, Judge Lorna Schofield consolidated the actions in the Southern District of New York for all purposes.  (Dkt. 41.)

Following limited discovery,[13] Danmar and Air Express filed a joint motion for summary judgment on December 18, 2023.  (Dkt. 61.)  The Vessel Owner filed its motion for summary judgment the same day.  (Dkt. 56.)  Plaintiffs filed their opposition on January 25, 2024, (Dkts. 75, 76), and Defendants replied on February 27, 2024 (Dkts. 81, 84.) The case has been referred to me for report and recommendation on dispositive motions, including the instant motion.[14]  (Dkt. 65.)

## STANDARD OF REVIEW

To obtain summary judgment under Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute of material fact.  Fed. R. Civ. P. 56(a). The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party."  *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Conversely, "[s]ummary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party."  *Banks v. General Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (internal quotation marks omitted).

---

[13] Discovery was stayed pending briefing of the motions for summary judgment.  (Dkt. 55.)

[14] The matter also had been referred to me for general pretrial purposes on April 11, 2023. (Dkt. 37.)

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order). Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Matsushita Electric Industrial Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

In assessing the record to determine whether there is a genuine issue of material fact, the Court must "eschew credibility assessments," *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal quotation marks omitted), and resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*,

477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

## DISCUSSION

The Defendants each move for summary judgment against all of Plaintiffs' claims. The Defendants argue they are exonerated from liability relating to any damage that may have occurred to the Cargo based on the "shipper's risk clause" in both bills of lading. In the alternative, Danmar and Air Express move for partial summary judgment limiting their liability to Plaintiffs to $21,200.00, while the Vessel Owner moves for partial summary judgment limiting its liability to £4,200 or, in the further alternative, to no more than £510,005. In opposition, Plaintiffs argue that the provisions allegedly exonerating Defendants from liability are not valid under the Harter Act and federal common law. Plaintiffs also assert that Defendants' liability should not be limited because the Harter Act, which governs the contracts at issue, does not limit liability relating to lost cargo.

### I.    The Harter Act Governs This Dispute

The Court first resolves the issue of whether COGSA – the Carriage Of Goods By Sea Act, 46 U.S.C. § 30701 (Statutory Notes and Related Subsidiaries),[15] or the Harter

---

[15] COGSA's statutory codification merits a mention. "COGSA was previously codified at 46 U.S.C. §§ 1300-1315. In 2006, Congress recodified Title 46 of the U.S. Code, and COGSA was uncodified but reprinted at 46 U.S.C. § 30701, historical and statutory notes." *Caddell Construction Co. (DE), LLC v. Danmar Lines Ltd.*, No. 18-CV-2900, 2018 WL 6726549, at *2 n.1 (S.D.N.Y. Dec. 20, 2018) (citing Pub. L. No. 109-304, 120 Stat. 1485 (2006)); *see also Rexroth v. Hydraudyne B.V. v. Ocean World Lines, Inc.*, 547 F.3d 351, 354 n.2 (2d Cir. 2008) (noting recodification and lack of substantive changes), *abrogated on other grounds*, *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89 (2010). The Court cites to the COGSA sections as reflected in the statutory notes to 46 U.S.C. § 30701. *See* Pub. L. No. 109-301; 120 Stat. 1485 (2006).

Act,[16] governs the bills of lading in this dispute.[17]

Both the Harter Act and COGSA compulsorily apply to shipments of goods to and from the United States.  The Harter Act, enacted in 1896, "applies to a carrier engaged in the carriage of goods to or from any port in the United States."  46 U.S.C. § 30702.  It regulates, among other things, "a shipper's contractual limitation of liability," *Federal Insurance Co. v. Great White Fleet (US) Ltd.*, No. 07-CV-2415, 2008 WL 2980029, at *9 (S.D.N.Y. Aug. 1, 2008), and imposes on the carrier a duty of proper "loading, stowage, custody, care, [and] proper delivery."  46 U.S.C. § 30704.  The Harter Act "has the effect of preserving the common law duty of a carrier to exercise due care in all handling of cargo, even when there are contrary contractual provisions."  *Gordon H. Mooney, Ltd. v. Farrell Lines, Inc.,* 616 F.2d 619, 623 n.6 (2d Cir.1980).  Under the Harter Act, "[a]lthough carriers [cannot] completely escape liability for their negligence in handling the cargo, they [can] effectively limit their liability to a sum well below the actual damage suffered." 2A–II Benedict on Admiralty § 12 at 2-6 (2024); *see e.g., Gold Medal Trading Corp. v. Atlantic Overseas Corp.*, 580 F. Supp. 610, 614 (S.D.N.Y. 1984) (holding that a package limitation "limiting liability to $500 per container" did not violate the Harter Act).

---

[16] Act of February 13, 1893, ch. 105, §§ 81-196, 27 Stat. 445-46, now codified at 46 U.S.C. §30701 *et seq*.

[17] While the Pacific Basin BOL identifies the Hague Rules contained in the International Convention for the Unification of Certain Rules Relating to Bills of Lading, dated Brussels, the 25 August, 1924 (the "Hague Rules") as the law that governs rights and liabilities of all parties to the bill of lading, the analysis of which law governs is the same as for COGSA because, as discussed above, COGSA was the United States' codification of the Hague Rules, and the relevant provisions – including with respect to on-deck cargo – are the same.  *J.C.B. Sales Ltd. v. M/V Seijin*, 921 F. Supp. 1168, 1170 (S.D.N.Y. 1996), *aff'd sub nom. J.C.B. Sales Ltd. v. Wallenius Lines (Wallenius Lines North American Inc.), In Personam*, 124 F.3d 132 (2d Cir. 1997).

COGSA, enacted forty years later in 1936, Represents the codification of the United States' obligations under the International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, August 25, 1924, 51 Stat. 233. This convention, which is also known as the Hague Rules, was the culmination of a multinational effort to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade. *J.C.B. Sales Ltd.,* 124 F.3d at 134 (emphasis in original) (quoting *Robert C. Herd & Co. v. Krawill Machinery Corp.*, 359 U.S. 297, 301, (1959)). COGSA applies by its own force during the period of time from when goods are loaded on a ship to when they are discharged from the ship. 46 U.S.C. § 30701 note §1(e). In contrast to the Harter Act, COGSA prescribes a carrier's limitation of liability in the event of damage to or loss of cargo to "$500 per package … or … per customary freight unit … unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading." 46 U.S.C. § 30701 note § 4(5).

COGSA, however, does not regulate cargo carried on the deck of a vessel.[18] 46 U.S.C. § 1301(c) (COGSA applies to "goods, wares, merchandise, and articles of every kind whatsoever, except live animals and cargo which by the contract of carriage is stated as being carried on-deck and is so carried"); *see also General Motors Corp. v. Moore-McCormack Lines, Inc.*, 451 F.2d 24, 25 n.1 (2d Cir. 1971) (holding COGSA does not apply to cargo stowed on-deck). To overcome this exclusion, parties must expressly state

---

[18] The Hague Rules similarly do not regulate on-deck cargo. *See Convention & Protocol of Signature Thereto, Between the United States of America & Other Powers Respecting Bills of Lading for the Carriage of Goods by Sea.*, 51 Stat 233 (Nov. 6, 1937) (Hague Rules apply to "goods, wares, merchandise, and articles of every kind whatsoever except live animals and cargo which by the contract of carriage in stated as being carried on-deck and is so carried").

in the bill of lading that COGSA also regulates on-deck cargo. *Sail America Foundation v. M/V T.S. Prosperity*, 778 F. Supp. 1282, 1286 (S.D.N.Y. 1991) (citing *General Motors Corp. v. Moore-McCormack Lines, Inc.*, 451 F.2d 24, 25 n.1 (2d Cir. 1971)).

Here, the Pacific Basin BOL clause paramount incorporates the Hague Rules (Danmar 56.1 Reply ¶ TT; Skoufalos Decl. Ex. 2, Clause 3), and the Danmar BOL incorporates COGSA and any "national law" that "compulsorily applies" (In Rem 56.1 Reply ¶ 34; Skoufalos Decl., Ex. 1, Clause 14.2). Neither bill of lading, however, purports to extend COGSA to on-deck cargo. Therefore, since it is undisputed that the Cargo at issue was stowed on the deck of the Vessel (*see* Danmar 56.1 Reply ¶ 66; In Rem 56.1 Reply ¶ 69), COGSA cannot govern the bills of lading.[19] The question then becomes whether the Harter Act still compulsorily applies where COGSA does not. Defendants, citing to authority outside of this Circuit, argue that the Harter Act cannot apply to the bills of lading because it is well established that COGSA superseded the Harter Act in international trade. (Danmar Mem. at 13 (citing to authority from the 9th Cir.); In Rem Mem. at 10 (same).) Consequently, Defendants posit, the terms of the contract, including the clauses allowing for Defendants' exoneration of liability, must be applied. (Danmar Mem. at 15; In Rem Mem. at 5.) The Court does not agree.

To be sure, the Second Circuit has held that COSGA superseded the Harter Act "with respect to the tackle-to-tackle period of international shipments,"[20] leaving the Harter

---

[19] Since COGSA does not govern, the Hague Rules too cannot govern the bills of lading.

[20] The tackle-to-tackle period is the time between the loading of the goods onto the ship and their discharge from the ship. *Royal & Sun Alliance Insurance., PLC v. Ocean World Lines, Inc.*, 612 F.3d 138, 142 (2d Cir. 2010) (citing 1–5 Saul Sorkin, Goods in Transit § 5.13(1)(c)).

Act to "govern the carrier's duties in international shipments prior to the time when the goods are loaded on the ship and after the time they are discharged from the ship, until proper delivery." *Sompo*, 456 F.3d at 70 n.15 (internal quotation marks omitted). Notwithstanding COGSA's supersession for the tackle-to-tackle period, courts in this Circuit have uniformly found that the Harter Act still applies to on-deck cargo, which COGSA excludes. *See e.g., Saudi Pearl Insurance Co. v. M.V. Aditya Khanti,* No. 95-CV-2174, 1997 WL 291834, at *3 (S.D.N.Y. June 2, 1997) ("Accordingly, the Court finds that COGSA does not apply to the [on-deck] shipments at issue here. Instead, the older Harter Act controls")*; Sompo*, 456 F.3d at 70 n.15 (citing *Blanchard Lumber Co. v. S.S. Anthony II*, 259 F. Supp. 857, 865 (S.D.N.Y. 1966) for the proposition that the Harter Act applies to "damage to goods in international trade during the tackle-to-tackle period, as long as the goods were carried on-deck").

In *Sompo*, when discussing the history of COGSA and the Harter Act, the Second Circuit acknowledged that COGSA superseded the Harter Act for the tackle-to-tackle period. *Id.* at 70 n.15. Nonetheless, the court noted that "because COGSA specifically exempts from its coverage goods stored on the deck of a ship, … courts have also held that the Harter Act applies to damage to goods in international trade during the tackle-to-tackle period, as long as the goods were carried on-deck." *Id.* (citing *Blanchard Lumber Co.*, 259 F. Supp. at 865).

While only persuasive and not controlling, district courts in this Circuit have reached the same conclusion. For example, the *Blanchard* court examined whether COGSA, the Canadian Water Carriage of Goods Act, or the Harter Act applied to a shipment of cargo that was lost at sea after it was carried on the deck of defendant's

vessel. *Blanchard Lumber Co.*, 259 F. Supp. at 864. The district court held that the Harter Act applied to the bills of lading at issue, notwithstanding COGSA's enactment. *Id.* at 865. In reaching its holding, the district court observed that "Section 12 of [COGSA], 46 U.S.C. § 1311, 'does not expressly preserve the Harter Act as to deck cargo from 'tackle to tackle'; (it) merely preserved the Harter Act before loading and after discharge.'" *Id.* (internal citations omitted). But "in the absence of an affirmative legislative expression to the contrary," the district court found "no reason for holding that the Harter Act is superseded in all cases by [COGSA] as to deck cargo in the 'tackle to tackle' period." *Id.*

The *Saudi Pearl* court followed suit. In *Saudi Pearl*, the plaintiff sought to recover the value of cargo lost at sea during an international voyage. 1997 WL 291834 at *1. The cargo, like the Rotaflex Machines, was carried on the vessel's deck and not stowed in containers. *Id.* The defendant seeking summary judgment argued it was not liable for the lost cargo because the cargo was carried on-deck at the shipper's own risk. *Id.* at *2. The district court found that COGSA did not apply to the shipments at issue because the cargo was carried on-deck and the bills of lading did not extend COGSA beyond its normal parameters. *Id.* at *3. The district court then held, albeit without explanation, that because COGSA did not apply to the on-deck shipments at issue, "the older Harter Act controls." *Id.*

Treatises and other authorities are to the same effect. *See e.g.*, 2A II Benedict on Admiralty § 14 (2024) ("It is clear from the legislative history that Congress intended the Harter Act to continue to apply to all cases not governed by COGSA"); Barbara J. Van Arsdale, Annotation, *Construction and Application of Harter Act*, 200 A.L.R. Fed. 249 (originally published in 2005) (citing cases within the Second Circuit holding Harter Act

applies to on-deck cargo); Michael F. Sturley, *An Overview of the Considerations Involved in Handling the Cargo Case*, 21 Tul. Mar. L.J. 263, 288 (1997) ("In cases where COGSA does not apply with the force of law – domestic carriage (in the absence of an express statement under the coastwise option), shipments under charter parties, most deck cargo, and damages outside the tackle-to-tackle period – the Harter Act is typically the governing statute. … [I]t is clear that Congress intended the Harter Act to continue to apply to maritime cargo cases not governed by COGSA").

The only authority cited by Defendants that is contrary comes from outside this Circuit.[21]  *See Chester v. Maritima del Litoral S.A.*, 586 F. Supp. 192, 198 (E.D. Wis. 1983).  The reasoning of that case, however, is faulty.  In *Chester*, the district court considered whether defendants were liable with respect to on-deck cargo under the Harter Act and concluded that the Harter Act "may not apply" to shipments of deck cargo. 586 F. Supp. at 198.  Relying on *Blanchard Lumber Co.*, the district court stated that the "Harter Act has been applied only where it is necessary to avoid 'a result strictly contrary to the one reached by American courts interpreting similar language in the comparable American statute, namely, [COGSA].'"  *Id.* (citing *Blanchard Lumber Co.*, 259 F. Supp. at 865).  But in citing *Blanchard* to support the inapplicability of the Harter Act to on-deck cargo, the *Chester* court ignored *Blanchard*'s holding just the opposite: that the Harter Act applies to shipments of on-deck cargo during the tackle-to-tackle period.  *Blanchard Lumber Co.*, 259 F. Supp. at 865.

---

[21] Defendants cite to a litany of cases that state COGSA has superseded the Harter Act in international trade, but Defendants cite to no case other than *Chester* discussing the Harter Act's applicability to on-deck cargo.

Moreover, *Chester* misstates the proposition it attributes to *Blanchard*. The *Blanchard* court did not hold that the Harter Act applies only when necessary to avoid a result contrary to COGSA. Rather, the court rejected the argument that the Canadian Water Carriage of Goods Act should be applied to the dispute at issue, because "the Canadian interpretation of [the Canadian Water Carriage of Goods Act] leads to a result strictly contrary to the one reached by American courts interpreting similar language in the comparable American statute, namely, [COGSA]." *Id.* The *Chester* court's statement thus was neither categorical nor in reference to the Harter Act.

In light of the consistent case law in this Circuit, and the parties not having expressly agreed to extend COGSA protections to on-deck cargo, the Court is constrained to find that the Harter Act regulates the on-deck Cargo during its ocean voyage in this case.

## II.    Defendants' Exoneration Of Liability Is Void

"As a general rule, a bill of lading cannot have the force of statute with the capability to supersede federal law, and, to the extent the Harter Act applies, it governs notwithstanding contrary provisions in the bill." *Federal Insurance Co.*, 2008 WL 2980029, at *9 (internal quotation marks and citations omitted); *see also English Electric Valve Co., v. M/V Hoegh Mallard,* 814 F.2d 84, 88 n.2 (2d Cir.1987) (holding clause void as it would "eliminate the operation of the Harter Act upon foreign trade"). The Harter Act provides, in relevant part, that "[a] carrier may not insert in a bill of lading or shipping document a provision avoiding its liability for loss or damage arising from negligence or fault in loading, stowage, custody, care, or proper delivery." 46 U.S.C. § 30704.

Here, it is undisputed that both bills of lading include liability provisions exonerating each respective carrier from any liability with respect to cargo stowed on the deck. (In Rem 56.1 Reply ¶¶ 12, 32; Danmar 56.1 Reply ¶¶ 14, 26; Skoufalos Decl., Ex. 1; Hamra Decl., Ex. 2.) Moreover, each bill of lading incorporates a "shipper's risk" clause on the front alerting the shipper of these liability provisions. (*Id.*) Because the bills of lading allow the Defendants to avoid "liability for loss or damage arising from negligence or fault in [their]…custody" or "care," each of Clause 4.3 of the Danmar BOL, Clause 15 of the Pacific Basin BOL, and the "Shipper's Risk" clause on the front of each bill of lading is void under the Harter Act and cannot exonerate Defendants from liability. 46 U.S.C. § 30704.

Even if the Harter Act did not apply, the exculpatory clauses, as they relate to on-deck cargo, are void under federal common law. Without citing to any authority, both Defendants argue that "nothing in [the] general maritime law precludes a court" from enforcing contractual terms agreed to by the parties in a maritime contract. (Danmar Reply at 3-4; In Rem Reply at 4.) But, as Plaintiffs point out, the Supreme Court has held that an "express stipulation by any common carrier for hire, in a contract of carriage, that he shall be exempt from liability for losses caused by the negligence of himself or his servants, is unreasonable and contrary to public policy, and consequently void. And such has always been the understanding of this court." *Liverpool & G.W. Steam Co. v. Phenix Insurance Co.*, 129 U.S. 397, 441-42 (1889) (collecting cases). The question is whether this principle applies to exonerations of liability in bills of lading with exonerations clauses like those at issue here.

Guidance can be found in *Sompo Japan Insurance Co. of America v. Norfolk Southern Railway Co.* where the Second Circuit reviewed an exoneration clause in a bill of lading to determine if it violated federal common law.  762 F.3d 165, 181 (2d Cir. 2014). The exoneration clause at issue provided "that, other than **the Carrier,** no Person, firm or corporation or other legal entity whatsoever … is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise."  *Id.* at 178 (emphasis in original). The Second Circuit held that the exoneration clause did not violate federal common law because it did not eliminate the negligence of all parties; rather, it simply concentrated all of the liability with the carrier.  *Id.* at 182.  The court explained that the exoneration clause, as written, did not violate the two principles that primarily animated the Supreme Court's concern in *United States v. Atlantic Mutual Insurance Co.*, 343 U.S. 236, 239 (1952) relating to express stipulations exempting common carriers from liability:  "(1) a desire to ensure that the cargo owner obtains full compensation for damage to its cargo,"[22] and "(2) concern that a contrary rule would induce the carrier to exercise less care."  *Id.*  at 183.  That is not the case here.

Unlike the exoneration clause in the bill of lading in *Sompo*, the clauses in the bills of lading at issue here violate the Supreme Court's principles because they eliminate **any**

---

[22] While the *Sompo* court characterized the Supreme Court's concern in *Atlantic Mutual Insurance Company* as ensuring the cargo owner obtains "full compensation" for damage to its cargo, the *Atlantic Mutual* Court was primarily concerned with the "Both-to-Blame" clause in the bill of lading that required cargo owners "to indemnify the carrier  … for any amounts the [Carrier] loses" if the ship came into a collision with another ship, effectively exonerating the carrier from the consequences of its own negligence.  343 U.S. at 238. The *Atlantic Mutual* court thus was not passing upon the issue of the extent to which a carrier could limit its liability at all, but rather the propriety of a carrier's complete absolution from its own negligence – the same public policy concern underpinning antipathy for exoneration clauses.

possibility for the owner to obtain any compensation for lost or damaged cargo that is on the deck of a vessel.[23]    There is also certainly a risk that the exoneration clauses, as written, give the carrier the excuse to exercise less caution handling the cargo because they exonerate the carrier from its own negligence.

In sum, Clause 4.3 of the Danmar BOL, Clause 15 of the Pacific Basin BOL, and the "Shipper's Risk" clauses on the front of each bill of lading are void and unenforceable under the Harter Act, as well as federal common law.  As a result, Defendants are not entitled to summary judgment on their claims seeking exoneration.  But as discussed in the following sections, the provisions limiting the monetary extent of the carriers' liability are valid and enforceable.

## III.    Which Bill Of Lading Governs

In the alternative to complete exoneration, Defendants argue that the bills of lading permit partial summary judgment to be granted, limiting Danmar and Air Express's liability, severally, to $21,000.00 and the Vessel Owner's liability to £4,200 (or, alternatively £510,005).  Before addressing whether Defendants' respective liability is limited as claimed, the Court first addresses Danmar's argument that it is protected by the Pacific Basin BOL.

---

[23] *See e.g.,* Hamra Decl., Ex. 2 ("50 units shipped on-deck at shippers/charterers risk and responsibility without liability on the part of the vessel/owners for any expense, delays, loss or damage howsoever caused and even if caused by owners' negligence or unseaworthiness of the vessel"; "Carrier shall not be liable for loss thereof or damage thereto" to cargo carried on-deck); Skoufalos Decl., Ex. 1 ("50 units shipped on-deck at shippers/charterers risk and responsibility without liability on the part of the vessel/owners for any expense, delays, loss or damage howsoever caused and even if caused by owners' negligence or unseaworthiness of the vessel"; "Goods which are stated on the front of this bill of lading to be carried on-deck, and which are actually carried on-deck, are carried without responsibility on the part of the Carrier for loss or damage of whatsoever nature arising during carriage of Goods by sea or inland waterway howsoever caused, whether caused by negligence or any other cause whatsoever").

To recap, there are two bills of lading.  The Pacific Basin BOL lists DHL Global as the "shipper," DHL Global Forwarding as the "consignee," Pacific Basin as the "carrier," and Imabari Logger as the "vessel."  (In Rem 56.1 Reply ¶¶ 3-5; Hamra Decl. Ex. 2; Danmar 56.1 Reply ¶¶ 16-19.)  The Danmar BOL lists Shandong Weatherford Highland Artificial Lift Equipment Co. as the "shipper," Weatherford as the "consignee," Danmar Lines Ltd. as the "carrier," and M/V Imabari Logger as the "vessel."  (Danmar 56.1 Reply ¶¶ 2-4; Skoufalos Decl. Ex. 1; In Rem 56.1 Reply ¶¶ 19, 21-22.).

Danmar argues it is entitled to rely on limitations of liability contained in the Pacific Basin BOL – a bill of lading to which it is not a party.  (Danmar Mem. at 20-21; Danmar Reply at 7-8.)  That is incorrect.  "[T]he liability of each defendant must be determined by reference to its own bill of lading ... consistent with [the] weight of authority, including caselaw from this circuit."  *Royal Insurance Co. v. M.V. ACX RUBY*, No. 97-CV-3710, 1998 WL 524899, at *2 (S.D.N.Y. Aug. 21, 1998) (collecting cases).  Indeed, "[c]ourts in this district have made clear that an upstream intermediary cannot co-opt the terms of a downstream carrier's bills of lading but must instead rely on the terms of its own bills of lading."  *American International Group Europe S.A. (Italy) v. Franco Vago International, Inc.*, 756 F. Supp.2d 369, 377 (S.D.N.Y. 2010).  For this same reason, Plaintiffs' argument that the Vessel Owner is bound by the liability provisions in the Danmar BOL is without merit.  (Pl. Opp. at 23-25.)

Therefore, Danmar's liability will be examined under the terms of the Danmar BOL, and the Vessel Owner's liability will be examined in accordance with the terms of the Pacific Basin BOL.

### IV.    Limitations Of Liability In The Bills Of Lading

Because Defendants argue that their liability should be limited by the express provisions in each respective bill of lading, the Court first analyzes whether those provisions are valid under the Harter Act.  If a Defendant's respective provision is valid, the Court will then determine whether each Defendant can limit its liability under the express terms in the applicable bill of lading.

### A.    The Provisions Limiting Liability Are Valid Under The Harter Act

The clauses at issue are Clause 12 of the Pacific Basin BOL and Clause 8 of the Danmar Bill BOL.  Both are distinct from the exoneration clauses that are void under the Harter Act, and both are valid and enforceable.

#### 1.  General Rules For Construing Bills Of Lading

Generally, "contracts for carriage of goods by sea must be construed like any other contracts: by their terms and consistent with the intent of the parties." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 16 (2004).  "Effect should be given to all the contract terms and the specific controls the general." *J. Aron & Co. v. Askvin*, 267 F.2d 276, 277 (2d Cir.1959) (citations omitted); *see also Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 822-23 (2d Cir.1981).  Where a bill of lading is ambiguous, "an interpretation that gives a reasonable and effective meaning to all terms of a [bill] is preferable to one that leaves a portion of the writing useless or inexplicable."  *Hartford Fire Insurance Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 558 (2d Cir. 2000).  The Court's "task ... is to construe the contract to give consistent effect, if possible, to all of its terms." *Pannell v. United States Lines Co.*, 263 F.2d 497, 498 (2d Cir. 1959).  But, because bills of lading are "contracts of adhesion," any ambiguities within

"are strictly construed against the carrier." *Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 482 (2d Cir.1985) (collecting cases).

**2.    Clause 12 of the Pacific Basin BOL is Valid Under the Harter Act**

Clause 12 of the Pacific Basin BOL limits liability to no more than £100 per package or freight unit absent express declaration and freight payment of a higher value.  In full, the provision reads:

> All claims for which the Carrier may be liable shall be calculated on the basis of the Merchant's net invoice cost, plus freight and insurance premium, if paid.  In no event shall the Carrier be liable for any loss of possible profit or any consequential loss. The Carrier for any loss of or damage to the goods shall be limited to an amount not exceeding £ 100 per package or freight unit unless the value of the goods higher than the amount is declared in Writing by the Shipper before receipt of the goods by the Carrier and inserted in this Bill of Lading and extra freight paid as required. If the actual value of the goods per package or per freight unit exceeds such value, the declared value shall nevertheless be deemed to be the declared value and the Carrier's liability if any, shall not be the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(Hamra Decl., Ex. 2, Clause 12.)

Although the Harter Act does not permit a carrier to exonerate itself from liability, it does permit a carrier to limit its liability.  *Thyssenkrupp Materials NA, Inc. v. M/V Kacey*, 236 F. Supp.3d 835, 842 (S.D.N.Y. 2017) (citing *Federal Insurance Co.*, 2008 WL 2980029, at *11).  The Vessel Owner argues the "Harter Act allows carriers to limit their liability to a reasonable amount," and thus, the Vessel Owner's liability should be limited in accordance with Clause 12 of the Pacific Basin BOL.  (In Rem Mem. at 14.)  The Vessel Owner is correct.

29

Plaintiffs do not argue that a limitation of £100 is unreasonable.  Instead, Plaintiffs argue that Clause 12 should be "deleted," and liability should be limited by the Hague Rules since that is the law that is explicitly referenced in the Pacific Basin BOL's Clause Paramount.  (Pl. Opp. at 24-25 (citing Hamra Decl., Ex. 2, Clause 3).)  But, as discussed above, the Hague Rules do not regulate on-deck cargo like that at issue here.  Plaintiffs also argue the liability provision is void under the Harter Act and that "the Court should hold that no limitation of any kind applies based on the Act's compulsory application."  (Pl. Opp. at 16).  That is not the law.  As explained above, the Harter Act prohibits exoneration but not limitations on liability.  Moreover, Plaintiffs' approach asks the Court to render a provision in the Pacific Basin BOL "useless," contrary to interpreting bills of lading to give "a reasonable and effective meaning to all terms of a contract."  *Hartford,* 230 F.3d at 558.

Clause 12 of the Pacific Basin BOL is valid and enforceable under the Harter Act.

### 3.    Clause 8 of the Danmar BOL is Valid Under the Harter Act

Clause 8 of the Danmar BOL limits carrier liability to $500 per package.  In relevant part, the clause provides:

> 8.1. The Carrier's liability in respect of any loss of or damage to the Goods or delay in the performance of the Services shall be determined and limited in accordance with the provisions of this clause 8 unless:
>
> 8.1.1 in the case of US Carriage, an international convention or national law (including US COGSA) compulsorily applies (**US Compulsory Legislation**), in which case the liability of the Carrier will be determined and limited in accordance with the provisions of such US Compulsory Legislation …
>
> 8.3 Amount of compensation …
>
> 8.3.4 for US Carriage, US$500 per Package or per the freight unit billed for Goods not packaged.

(Skoufalos Decl., Ex. 1; Danmar 56.1 Reply ¶ 15; In Rem 56.1 Reply ¶ 33.)   Danmar argues that under the Harter Act, its liability should be limited in accordance with the express language of Clause 8.  (Danmar Mem. at 15.)  Plaintiffs argue that the Harter Act "has no limitation for cargo loss or damage," and thus, the limit of liability is not valid.  (Pl. Opp. at 12.)  The Court agrees with Danmar.

Plaintiffs once again misread the Harter Act.   The Harter Act does not allow complete exoneration; but it does not prohibit limitation of liability, and courts uphold such limitations.  *See, e.g.*, *Thyssenkrupp Materials NA, Inc.*, 236 F. Supp.3d at 842 (upholding clauses in bill of lading limiting liability under Harter Act because they did not absolve the shipowner's agents of liability); *Federal Insurance Co.*, 2008 WL 2980029, at *11 (holding a $500-per-container liability limitation would be valid under the Harter Act); *Gold Medal Trading Corp.*, 580 F. Supp. at 614 (S.D.N.Y. 1984) (holding that package limitation "limiting liability to $500 per container" was valid under the Harter Act); *see also Starrag v. Maersk, Inc.*, 486 F.3d 607, 617 (9th Cir. 2007) (holding Harter Act did not prohibit clause limiting carrier's liability to $500 per package).   The Danmar BOL only limits Danmar's liability to $500 "per Package or per the freight unit billed for Goods not packaged" – it does not allow Danmar to completely escape liability for its negligence. Clause 8 of the Danmar BOL thus is valid under the Harter Act.

## B.    Determining The Base Unit For Calculating Limitation Amount

Both Defendants argue that if the Harter Act applies, each Rotaflex Machine should be treated as a package for the purposes of valuing liability.  In the alternative, Defendants argue each Rotaflex Machine is either a freight unit or customary freight unit. A freight unit is a measure used to calculate freight charges.  *See Vigilant Insurance Co.*

*v. M/T Clipper Legacy*, 656 F. Supp.2d 352, 357 (S.D.N.Y. 2009) (citing *FMC Corp. v. S.S. Marjorie Lykes,* 851 F.2d 78, 80 (2d Cir.1988)).  An example of a freight unit would be a cubic meter.  Whether liability is based on packages or freight units can have a material impact on the amount recovered by the cargo owner.  For example, consider a scenario where the applicable limitation of liability is $500 per package or freight unit; the cargo consists of 50 packages with a volume of 5,000 cubic meters; and there is a total loss of all cargo.  If liability is based on the number of packages, total liability would be $25,000.  If the number of cubic meters is the relevant measure, however, total liability would be $2,500,000.

The question of what constitutes a "package" and whether limitation of liability is determined based on packages or freight units arises mainly in the COGSA context.  The parties have not cited any case law addressing the issue in the context of the Harter Act.  The COGSA cases nonetheless are instructive.  An article completely enclosed in some container is considered a package.  *See, e.g.*, *Mitsubishi International Corp. v. S.S. Palmetto State*, 311 F.2d 382, 384 (2nd Cir. 1962) ("an article completely enclosed in a wooden box prepared for shipment is a package").  At the other extreme, an item with no packaging at all is not considered a package.  *See, e.g., Petition of Isbrandtsen Co.,* 201 F.2d 281, 286 (2d Cir.1953) (uncrated locomotive not COGSA "package"); 2A *Benedict on Admiralty* § 167, at 16–35 ("cargo that is shipped without any packaging whatsoever is generally treated as 'not shipped in packages'").  As for the "in-between," where cargo is not fully crated or enclosed, cargo is considered a package if "***some*** packaging preparation for transportation has been made which facilitates handling, but which does

not necessarily conceal or completely enclose the goods." *Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 334 (2d Cir. 1972) (emphasis added).

Here, there is no doubt that the preparation of the Rotaflex Machines for shipment qualifies them as "packages."  It is undisputed that before the Rotaflex Machines were sent for shipment, the manufacturer prepared the machines by placing bubble wrap, a shipping cover (consisting of sheet metal and packaging foam), and braided cables around each Rotaflex Machine.  (Danmar 56.1 Reply ¶¶ 56-59; In Rem 56.1 Reply ¶¶ 59-62.)  The Data Book also instructs persons handling the machines to leave the "protection material or equipment" on the Rotaflex Machine until it has been brought to the wellsite.  (Danmar 56.1 Reply ¶ 64; In Rem 56.1 Reply ¶ 67.)  In other words, each machine had "some packaging preparation for transportation" and thus is considered a package.  *Nichimen*, 462 F.2d at 334.

The bills of lading are also relevant to the inquiry, as they reflect the parties' intent.  As the Second Circuit has explained:

> We begin with a bill of lading's use of the term "package," and will adopt the unit of packaging unambiguously identified in the bill of lading. In the event of ambiguity, we look elsewhere in the bill of lading and to other evidence of the parties' intentions.
>
> …
>
> The number appearing under the heading "NO. OF PKGS." is our starting point for determining the number of packages for purposes of the COGSA per-package limitation, and unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as "packages," it is also the ending point of our inquiry. "Package" is a term of art in the ocean shipping business, and parties to bills of lading should expect to be held to the number that appears

under a column whose heading so unmistakably refers to the
number of packages.

*Seguros Illimani S.A. v. M/V Popi P*, 929 F.2d 89, 94 (2d Cir. 1991) (internal citations
omitted).  Here, the Court finds each BOL is unambiguous – the parties treated each
machine as a package for a total of 50 packages.

### 1.    Liability For The Pacific Basin BOL Is Based On Packages

The Pacific BOL expressly and repeatedly refers to "packages" and there being 50
of them.  For example, the second column heading is "number and kind of packages,
description of goods."  The entry underneath is "50PACKAGES."  (Hamra Decl., Ex. 2.)
The column to the immediate right lists the total gross weight and volume.  Under those
entries, in no specific column, "SHIP'S REMARKS" are provided that include two more
references to the Cargo as packages.  (*Id.* ("DUST ON THE OUTER SURFACE
AFFECTED ALL PACKAGES"; "of which 50Packages/1427.7MT on-deck at Shipper's
risk").)  Immediately following that entry, still within the ship's remarks section, there is
one mention of units.  (*Id.* ("50 units shipped on-deck at shippers/charterers risk ….").)
The entry in the "Freight and Charges" box at the bottom of the bill of lading reads
"FREIGHT PREPAID," with no amount due to be collected for freight charges, and no
explanation of the charges.  The bill of lading makes no reference to either the term
"freight unit" or "customary freight unit."

In short, the bill of lading expressly identifies the Cargo as consisting of 50
packages and repeatedly refers to "packages," including with respect to the shipper's risk
provision.  *Cf. Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam, Her Engines,
Boilers, Etc., Nedlloyd Lijnen B.V. (Nedlloyd Lines)*, 759 F.2d 1006, 1013 (2d Cir. 1985)
(holding parties did not intend for plants to be packages where bill of lading made no

34

reference to packages or how the plants were packaged). Although there is one mention of "units," it appears in quotes under "SHIP'S REMARKS" and is not attributed to either Pacific Basin or Plaintiffs. *See Mapfre Atlas Compania de Seguros S.A. v. M/V LOA*, No. 15-CV-7876, 2017 WL 3332234, at *5 (S.D.N.Y. Aug. 3, 2017) (finding one reference to "pieces" did not overcome several references to "packages"). Contrary to Plaintiffs' argument, there is no ambiguity in the Pacific Basin BOL. Whether referred to as packages or units, the number of them is the same: 50.

Moreover, the Pacific Basin BOL bears no indication of any other unit of measurement that would be used to determine limitation of liability. *Cf. Norwich Union Fire Insurance Society, Ltd. v. Lykes Brothers S.S. Co.*, 741 F. Supp. 1051, 1057-58 (S.D.N.Y. 1990) (looking to freight charges that established the freight unit used was the far more voluminous "per container," as would be more favorable for the carrier, not "per package," as would be more favorable for the cargo owner). While the gross weight and volumetric measurement of the Rotaflex Machines do appear on the bill of lading, they are not listed under the "Freight and charges" heading. Thus, the parties could not have intended those measurements to be the relevant units for applying the limitation of liability. *See e.g., Henley Drilling Co. v. McGee*, 36 F.3d 143, 150 (1st Cir. 1994) (holding liability should be calculated per each item of cargo where there was "nothing to link weight with the freight charge" on the bill of lading).

As reflected in the Pacific Basin BOL, the parties treated each Rotaflex Machine as a package for a total of 50 packages. That is fully consistent with the fact that each

machine was outfitted with some packaging. The Vessel Owner's partial motion for summary judgment should be granted limiting its liability to £100 per Rotaflex Machine.[24]

### 2.    Liability In The Danmar BOL Is Based On Packages

The Danmar BOL is similar to the Pacific Basin BOL in that it includes many references to "package," "packages," and "50 packages." Similarly, it expressly identifies the number and kind of packages as "50 package(s)." It also includes the same "SHIP'S REMARKS," referencing "package" and one mention of "units." (*See* Skoufalos Decl. Ex. 1.) And, as discussed above, each Rotaflex Machine was prepared with packaging materials.

There are, however, two notable differences in the Danmar BOL. First, unlike the Pacific Basin BOL, which contains no information about the freight charges (other than being pre-paid), the Danmar BOL under the heading "Freight and charges" indicates that the "ocean freight" was calculated based on 6083.70 cubic meters at a rate of $203.00, totaling $1,234,991.10. The parties thus used a measure, other than the number of packages, to determine the freight charges paid by the shipper. That makes sense. A

---

[24] At the current rate of exchange, £100 is the equivalent of approximately $128. Although not complete exoneration, a limitation of $128 per package, depending on the particular type of cargo, may not be materially different from complete exoneration. Consider, for example, paper versus diamonds. Assume one box of 10 reams of paper is one package. That package is likely to have a value well under $128, and the shipper would receive full compensation for every lost box of paper. In contrast, assume one package consists of 10 diamonds, each of which has a value of $10,000. The shipper would receive only $128, and thereby would face almost near total loss on its $100,000 worth of cargo. That is not unlike the situation here, where each Rotaflex Machine costs approximately $90,000. (Dkt. 1, Schedule A.). In short, at some point, a limitation of liability, if it is low enough, may not be materially different from exoneration, and thus contrary to public policy. *See e.g., Hanover Insurance Co. v. Shulman Transport Enterprises*, 581 F.2d 268, 274 (1st Cir.1978) (invalidating $50-per-shipment liability limitation clause because it was "so low as to offend public policy"). The Court, however, is not presented with that issue as Plaintiffs have not made that argument, and none of the other parties has raised it.

package unit does not correlate well with the resource unit – cargo space – provided by the carrier; large packages will take up far more cargo space than the same number of much smaller packages.  Similarly, weight could be an apt unit for determining freight charges, to the extent that heavier packages consume more energy to carry than the same number of lighter-weight packages.  Put differently, it is not surprising that parties would calculate freight charges using a different type of unit than the number of packages while still basing limitation of liability on the number of packages.

In some cases, courts have found freight charge calculations in a bill of lading relevant to or even determinative of the parties' intent with respect to limitations' units. *See e.g., Allied Chemical*, 775 F.2d at 484; *Mapfre*, 2017 WL 3332234, at *5 (parties intended cargo to be assessed as packages where freight rate was set at "$1,080.00 per package").  In *Allied Chemical*, the carrier's insurer argued that its liability was limited to $500 per "pallet," of which there were 150.  775 F.2d at 484.  The bill of lading provided in relevant part that the carrier's liability for damages was limited to $500 per package "unless the nature and value of [the] goods have been declared by the shipper before shipment and inserted in the Bill of Lading and extra freight paid.'"  *Id.* at 484-85.  The bill of lading also contained the following information:  the first column headed "No. of Pkgs." contained the entry "150," while the entry for "Description of Packages and Goods" was entered "Double Faced Pallets Said to Contain: 6000 Bags Caprolactum [sic]." Just above that entry, in the same column, it stated "Rate: $110.00 L[ong] T[on] Value: $1657.00 LT." *Id.* at 485.  "Looking only at the numbers," and the reference to both "Pallets" and "Bags" in the description of the packages and goods, the court found the bill of lading ambiguous as to the parties' intent.  *Id.*  In looking for other evidence of the parties' intent, the court

found that the entry of the freight charge on the bill of lading was evidence that "the parties did not intend the pallets to be packages." *Id.* The court reasoned that the calculation of the freight charge was evidence of the shipper's intent to declare "the nature and value of goods" on the bill of lading in accordance with the option to do so under the liability provision in the bill of lading. *Id.* The parties thus could not have intended for the per package limitation to apply for the purpose of determining liability. *Id.*

The instant case is materially different than *Allied*. First, the *Allied* bill of lading was ambiguous as to whether the cargo was in fact a package – no such ambiguity exists here. The Danmar BOL contains numerous references to "packages," the number of packages (and "units") is repeatedly identified as 50, and there is no alternative unit description other than package in the description of goods as there was in the *Allied* description of "pallets" and "bags." Second, the Danmar BOL does not contain a limitations provision like the one in *Allied* limiting liability to $500 per package "unless" the shipper declared the nature and value of the goods in the bill of lading and paid extra freight. The Danmar BOL states the amount of compensation a shipper will receive for lost or damaged cargo, without regard to any declaration by the shipper of an alternative value. (Skoufalos Decl., Ex. 1.) The freight charge calculation in the Danmar BOL thus does not carry the same evidentiary import of intent that it did in *Allied*.

As support for their position that the freight charge description in the Danmar BOL is determinative, Plaintiffs cite to *G.E. Power Systems v. Industrial Maritime Carriers (Bahamas), Inc.*, 89 F. Supp.2d 782 (E.D. La. 2000). In that case, the court concluded that a single turbine, "which was not contained in a package, box or crate, was covered only partially by two tarpaulins which in no way concealed the turbine, and was not

attached to a skid or pallet, and whose transportation charges were based upon volume, not by package, [was] not a package within the meaning of COGSA." *Id.* at 784. Putting aside that *G.E. Power* is a non-controlling, out-of-circuit case, the Court finds it incompatible with the Second Circuit's recognition that to be a package, an item need only be partially packaged, not "concealed." Rather, to be a package, an item must have "some packaging preparation for transportation that facilitates handling." *Nichimen*, 462 F.2d at 334. Second, the Court is not aware of any requirement in this Circuit that an item cannot be a package unless attached to a skid or pallet. And, in any event, the facts are materially different: the Rotaflex Machines were not simply partially covered by tarpaulins as in *G.E. Power*, but instead were each outfitted with packaging, including "bubble wrap, a shipping cover (consisting of sheet metal and packaging foam), and braided cables" around each Rotaflex Machine. (Danmar 56.1 Reply ¶¶ 56-59; In Rem 56.1 Reply ¶¶ 59-62.)

The second distinguishing feature of the Danmar BOL further confirms that each Rotaflex Machine is a package to which the $500 limitation applies. Section 8.3.4 of the Danmar BOL expressly limits liability to "$500 per Package or per the freight unit billed for Goods not packaged." (Skoufalos Decl., Ex. 1; Danmar 56.1 Reply ¶ 15; In Rem 56.1 Reply ¶ 33.) As discussed above, it is indisputable that each Rotaflex Machine was outfitted with packaging. Conversely, it is indisputable that the Cargo therefore does not qualify as "Goods not packaged." Accordingly, freight charge units simply do not come into play. *See Seguros Illimani*, 929 F.2d at 94 (stating that the number appearing under the heading "NO. OF PKGS." is the "starting point" and "ending point of our inquiry" …

"unless the significance of that number is plainly contradicted by contrary evidence of the parties' intent, or unless the number refers to items that cannot qualify as 'packages'").

Accordingly, Danmar's motion for partial summary judgment should be granted, limiting its liability to $500 per Rotaflex Machine.

## V.    Liability Under the MTSA

Air Express argues that any liability it may face is limited to COGSA's $500 per package limitation, because COGSA is incorporated into the express terms of the MTSA. (Danmar Mem. at 22-23.)   Plaintiffs argue that COGSA does not apply, because the MTSA does not have express language extending COGSA's application to on-deck cargo.   Instead, Plaintiffs assert that the Harter Act governs the MTSA, and, accordingly, Air Express should be "held liable for the full extent of Plaintiffs' damages without limitation of any kind."  (Pl. Opp. at 28.)

COGSA does not apply to a freight forwarder like Air Express.   *See Salis v. American Export Lines*, 331 F. App'x 811, 814 (2d Cir. 2009) ("COGSA does not apply to a freight forwarder such as [the defendant]") (citing *Prima United States Inc. v. Panalpina, Inc.,* 223 F.3d 126, 129-30 (2d Cir. 2000)).   However, the MTSA expressly incorporates COGSA into its liability provision.   In relevant part, the MTSA states that:

> International transportation by air, ocean, road, or rail is subject to and governed with the force of law by the liability provisions contained in the following international conventions or statutes, as applicable and without limitation … the United States Carriage of Goods by Sea Act, 46 U.S.C. App. §§ 1300 et seq. ("COGSA") … For all other Services not governed by a specific statute or international convention, Company's liability shall be limited to 8.33 SDR per kilo.[25]

---

[25] "SDR" is an acronym for Special Drawing Rights – "an artificial currency, the exchange rate for which is published daily by the International Monetary Fund. The value of an SDR fluctuates based on the global currency market, and, under the Montreal Treaty, Art. 23,

(Danmar 56.1 Reply ¶ UU.)  The MTSA does not contain an express statement extending COGSA's application to cargo carried on-deck.

Defendants argue that the omission does not preclude COGSA's applicability because "the MTSA makes no distinction between on-deck and below-deck cargo; COGSA applies in all instances to *all* international transportation by ocean."  (Danmar Reply at 8-9 (emphasis in original).)  Defendants misstate the law.  By the statute's own terms, COGSA does not apply to on-deck cargo – it only applies to on-deck cargo where the parties have expressly incorporated it as a contractual term to extend to on-deck cargo.  *See Sail America Foundation*, 778 F. Supp. at 1286.  Without such express language, COGSA does not apply to the on-deck Cargo at issue.  Accordingly, Air Express's liability is not limited by COGSA to $500 per package.

Plaintiffs argue that if COGSA does not govern, the MTSA should be governed by the Harter Act, and Air Express should be held liable "for the full extent of Plaintiffs' damages without limitation of any kind."  (Pl. Opp. at 28.)  That argument assumes that the Harter Act is applicable to freight forwarders even though COGSA is not.  Whether that is so is unclear.  A freight forwarder "secure[s] cargo space with a steamship company, give[s] advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arrange[s] to have the cargo reach the seaboard in time to meet the designated vessel."  *See New York Foreign Freight Forwarders and Brokers Association v. Federal Maritime Commission,* 337 F.2d 289, 292 (2d Cir.1964).  A freight forwarder thus does not fulfill the same functions as a carrier.  Generally, a freight

---

is determined at the date of the judgment."  *Coppens v. Aer Lingus Ltd.*, No. 14-CV-6597, 2015 WL 3885742, at *7 n.2 (E.D.N.Y. June 22, 2015) (internal citations omitted).

forwarder does *not* issue a bill of lading and is therefore not liable to a shipper for anything that occurs to the goods being shipped," so long as the freight forwarder limits their role to arranging for transportation.  *Prima United States Inc.*, 223 F.3d at 129 (emphasis in original) (internal citations omitted).

Here, the evidence suggests that Air Express performed tasks outside of the limited role of a freight forwarder.  Plaintiffs allege that Air Express "was hired to arrange, perform and/or provide essential services intended to facilitate accomplishment of the transportation of the Shipment by sea. Such services included, but were not limited to, "charter fixture arrangements, hiring of the non-vessel operating carrier and the vessel operating carrier, issuance of the Sea Waybill, intended pre-voyage inspection of onboard cargo stowage arrangements, freight forwarding services, voyage monitoring services, and notify party and cargo release duties."  (Skoufalos Decl. Ex. 10 ¶ 11.)  The MTSA states that Air Express will perform the following services for Weatherford: crating and packaging of goods; arranging, managing and tracking transportation and logistics; filing an export declaration; liaising with the consignee's custom's broker for delivery and shipping documents; and informing Weatherford of delay in transport.  (*Id.*, Ex. 11, Statement of Work at ECF16-22.)

But whether Air Express acted outside of the role typically assigned to a freight forwarder is academic and need not be resolved.  Air Express's liability under the MTSA remains the same whether or not the Harter Act applies.  If the Harter Act applies, a limitation of liability is permitted even if complete exoneration is not.  The provision limiting liability to 8.33 SDR per kilo would not be void.  If the Harter Act does not apply, the

contractual limitation still applies.  Thus, any liability for loss or damaged products that Air Express may face should be limited to 8.33 SDR per kilo.

Accordingly, Air Express's motion for summary judgment to limit their liability to $500 per package under COGSA's exception should be denied.

## CONCLUSION

For the reasons stated above, I recommend that:

1.    Defendants' Motions for Summary Judgment to dismiss Plaintiff's claims in their entirety be DENIED;

2.    Danmar's motion for partial summary judgment be GRANTED insofar as its liability is limited by the Danmar BOL and that the amount of its liability is limited to $500 per package.

3.    Defendant M/V Imabari Logger's motion for partial summary judgment be GRANTED insofar as its liability is limited by the Pacific Basin BOL and that the amount of its liability is limited to £100 per package.

4.    Defendant Air Express's motion for partial summary judgment that its liability be limited to $500 per package be DENIED; instead, Air Express's liability should be limited to 8.33 SDR per kilo.

To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be either moot or without merit.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Any party shall have fourteen (14) days to file a

written response to the other party's objections.  Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007.  Any request for an extension of time for filing objections must be addressed to Judge Schofield.  **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: August 23, 2024
        New York, New York

Copies transmitted this date to all counsel of record.